# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, | CIVIL ACTION NO. 3:18-CV-0094 |
| Plaintiff, | (SAPORITO, J.) |
| v. | |
| BOBRICK WASHROOM EQUIPMENT, INC., | |
| Defendant. | |

## MEMORANDUM

On October 25, 2017, Travelers Property Casualty Company of America ("Travelers") filed this action against Bobrick Washroom Equipment, Inc. ("Bobrick") in the U.S. District Court for the Central District of California seeking to recoup approximately $7,300,000 in counsel fees and costs associated with *Scranton Products, Inc. v. Bobrick Washroom Equipment Inc.*, No. 3:14-CV-00853 (M.D. Pa.) (the "underlying action"). (Doc. 1). But over eight years later, including a transfer to the U.S. District Court for the Middle District of Pennsylvania, this case has yet to be fully litigated on its merits.

On September 27, 2018, in response to a document request from

Bobrick, Travelers inadvertently disclosed alleged privileged materials. On November 15, 2018, Bobrick filed a letter informing the court about the inadvertent production issue, as well as Bobrick's position that the production of those documents by Travelers resulted in a waiver of privilege under Federal Rules of Evidence 502(b). In a November 19, 2018, response to Bobrick's letter, Travelers argued to the court that its inadvertent production of documents did not waive the privilege because its legal counsel took reasonable steps to prevent the inadvertent production under Rule 502(b)(2).[1] Nonetheless, since that response on November 19, 2018, the issue of whether Travelers waived privilege of those documents remained unresolved.[2]

On September 8, 2025, Bobrick informed the court that an evidentiary hearing would be necessary to resolve the issue of whether

---

[1] The issue of whether privilege is waived in an inadvertent disclosure of documents is governed by Rule 502(b) of the Federal Rules of Evidence.

[2] On November 1, 2024, Bobrick filed a motion to compel the production of the inadvertently disclosed documents, arguing that Travelers waived any attorney-client and work product privileges by putting those communications "at issue" in a defense in this action. (Doc. 176). On July 17, 2017, we denied Bobrick's motion on the basis that merely invoking the protections of Rule 502(b) of the Federal Rules of Evidence does not put those protected communications "at issue" for purposes of a waiver. (Doc. 201).

Travelers waived its privilege of those documents that were inadvertently produced to Bobrick on September 27, 2018. (Doc. 208). On September 11, 2025, Travelers argued that an evidentiary hearing was unnecessary to determine the issue of waiver of privilege. (Doc. 209). After consideration of each party's position, we scheduled an evidentiary hearing on November 6, 2025, to conclusively determine the issue of whether Travelers waived its privilege through the inadvertent disclosure of documents. (Doc. 216). The hearing was conducted over a period of two days on November 6, 2025, and November 18, 2025, consisting of eighty-six exhibits and testimony from seven witnesses. Both parties have submitted briefs regarding the inadvertent disclosure issue (Doc. 243; Doc. 244) and the matter is now ripe for review.

## I.    Legal Standard

The Federal Rules of Civil Procedure allow parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). There are two types of privilege. The attorney-client privilege "protects from disclosure confidential communications made between attorneys and clients for the purpose of obtaining or providing legal assistance to the client." *In re*

*Grand Jury Subpoena*, 745 F.3d 681, 687 (3d Cir. 2014) (internal citation omitted). The work-product privilege protects "tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representatives (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3).

An attorney may waive privilege while acting on behalf of his client. *See Westinghouse*, 951 F.2d at 1420, 1431 (waiving attorney-client privilege as to documents provided to a third party by attorneys at behest of a client). When an attorney inadvertently discloses privileged communications, they become subject to the possibility of waiver. *See* Fed. R. Civ. P. 502(b); *Fid. & Deposit Co. of Maryland v. McCulloch*, 168 F.R.D. 516, 523 (E.D. Pa. 1996) ("[W]hile the attorney-client privilege belongs to the client, the attorney, acting as the client's agent, may be sufficiently negligent in protecting the privilege that it may be waived"); *Maldonado v. New Jersey ex rel. Admin. Office of Courts-Prob. Div.*, 225 F.R.D. 120, 128 (D.N.J. 2004) (discussing "the doctrine of waiver of the attorney-client privilege resulting from the inadvertent disclosure by an attorney").

Rule 502 of the Federal Rules of Evidence governs waiver of

attorney-client privilege or work-product protection. Rule 502(a) addresses intentional waiver, such as where "a party intentionally puts protected information into the litigation in a selection, misleading and unfair manner." Expl. Note to Fed. R. Evid. 502. Rule 502(b) deals with inadvertent disclosures of privileged materials, instructing that a disclosure does not operate as a waiver in a federal or state proceeding if: "(1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)." Fed. R. Evid. 502(b). When determining whether a party waived privilege in an inadvertent disclosure, district courts in the Third Circuit have weighed the following five factors:

> (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document productions; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosure; and (5) whether the overriding interests of justice would or would not be serviced by relieving the party of its errors.

*In re Niaspan Antitrust Litig.*, No. 13-MD-2460, 2017 WL 3668907, at \*2 (E.D. Pa. Aug. 24, 2017) (citing *Ciba-Geigy Corp. v. Sandoz Ltd.*, 916 F.

Supp. 404, 411 (D.N.J. 1995)).

## II.    Discussion

The issue of whether a party has waived privilege under Rule 502(b) of the Federal Rules of Evidence appears to be a narrow one generally, *see* Fed. R. Evid. 502(b)*,* but in this action, the issue is even more narrow. Bobrick has conceded two of the elements: (1) that the disclosure was inadvertent and (3) that Travelers promptly took reasonable steps to rectify the error. (Doc. 243, at 13) ("There is no dispute over Rule 502(b)'s first and third prongs."); The sole issue before the Court is whether Travelers took reasonable steps under the second element to prevent the inadvertent disclosure of documents under Rule 502(b)(2) of the Federal Rules of Evidence.

### A. Mr. Peterson's Original November 19, 2018 Letter

On November 19, 2018, Mark Peterson, then-counsel for Travelers, wrote the Court a letter detailing how the inadvertent disclosure of privileged documents occurred and how Travelers had taken reasonable steps to prevent that inadvertent disclosure. (Doc. 61).[3] Mr. Peterson

---

[3] All information contained in this subsection is taken from that letter. (Doc. 61).

explained that Travelers enlisted the help of Epiq Global ("Epiq"), a worldwide legal service vendor providing administrative support for eDiscovery services, to handle its discovery request and contracted with Epiq because:

> Epiq is one of the largest resellers of Relativity, which is one of the most widely used software platforms for the review and production of electronically stored information. Epiq has been performing hosting and document review services for Travelers since 2014. Epiq has handled more than 200 matters for Travelers across the country and elsewhere.

Moreover, Mr. Peterson had previously worked with Epiq in two other cases and found Epiq to be "highly capable and reliable."

At some point, Mr. Peterson provided Epiq with Bobrick's requested documents and asked Epiq to perform e-mail threading and deduplication services on those documents.[4] Mr. Peterson explained that

---

[4] "Threading" and "deduplication" services are aimed to greatly reduce the time and complexity of reviewing documents. The deduplication process removes duplicate files in a document set so that a lawyer may review only one of those files, rather than each additional duplicate files as well. *See* (Doc. 230, at 7) ("[I]f you have the same email five times, after deduplication, you would only have to review one of the documents. It helps to make the review go quicker."). The threading process combines multiple email chains into a single, organized conversation so that an individual sees the entire history of the conversation in one document, rather than across multiple documents.
*(continued on next page)*

those services produced numerous redundant and deduplicated documents that were subsequently moved into an administrative folder. This folder was neither accessible nor visible to Travelers, only to Epiq.

Mr. Peterson stated that he personally reviewed the remaining 12,000 documents for privilege and work-product protection over a period of twenty-five hours. He articulated that he did not delegate any of this work to any other lawyer. He explained that when he finished reviewing those documents and added redactions to preserve privilege, Epiq numbered the pages and published the redacted documents for production to his firm and to counsel for Bobrick. But unknown to Mr. Peterson, Epiq had mistakenly added the previously segregated deduplicated and redundant documents into the final folder with Mr. Peterson's previously reviewed documents. Therefore, when Travelers produced those documents to Bobrick, it produced those that were both reviewed and unreviewed for privilege.

Mr. Peterson, in that letter, concluded that Travelers took

---

*See* (*id.*) ("[E]mail threading is … another choice to load the emails into the review platform where you end up with … the latest thread of that conversation … so you're not having to review multiple pieces of the email chain separately.").

reasonable steps to protect the inadvertent disclosure because he personally reviewed all 12,000 documents for privilege that were available to him, and he reasonably relied on a prominent eDiscovery firm to help with the discovery requests.

### B.    The November 6, 2025, and November 18, 2025, Hearings

Almost seven years after Mr. Peterson's letter, we scheduled evidentiary hearings on November 6, 2025, and November 18, 2025, to conclusively determine the issue of whether Travelers waived its privilege through the inadvertent disclosure of documents.[5] The evidence in those hearings not only expanded upon the details included within Mr. Peterson's letter but also substantiated many of his claims. We have outlined the facts in the paragraph below.

Travelers filed this action in 2017 against Bobrick seeking to recoup approximately $7,300,000 in counsel fees and costs associated with the case, *Scranton Products, Inc. v. Bobrick Washroom Equipment, Inc.*, No. 3:14-CV-00853 (M.D. Pa.). (Doc. 1). As part of the discovery process, on July 16, 2018, Bobrick requested documents from Travelers concerning Travelers's claims to the settlement proceeds from the underlying action.

---

[5] This action was reassigned to the undersigned on October 8, 2024.

*See* plaintiff's exhibit (Doc. 1). Travelers subsequently enlisted Epiq to help process Bobrick's discovery request. *See* plaintiff's exhibit (Doc. 2). Natalia (Majewski) Stachowski[6] was assigned as Epiq's primary project manager to help with Travelers's services. *See* plaintiff's exhibit (Doc. 2).

Travelers subsequently provided Epiq with Bobrick's requested documents to upload and store on the Relativity software platform. *See* plaintiff's exhibit (Doc. 3). At the direction of Mr. Peterson, Travelers asked Epiq to perform e-mail threading and deduplication services of those documents. (*Id.*). On September 17, 2018, Mrs. Stachowski informed Travelers that Epiq had applied those processes and provided Travelers with the updated data file. *See* plaintiff's exhibit (Doc. 4). However, unbeknownst to Travelers, the threading and deduplication services resulted in 611 redundant documents that were placed in a separate administrator folder only visible to Epiq. *See* (Doc. 230, at 18) ("[T]he 611 documents … were in a secured and locked folder that only Epiq could see and Cates Peterson could not see.").

---

[6] At the time of the underlying events, Natalia's last name was "Majewski," and she is referred to as "Natalia Majewski" in all exhibits. Since the underlying events, however, Natalia has changed her last name from "Majewski" to "Stachowski" because of her marriage.

After receiving the updated document data set, Mr. Peterson began to review those documents for privilege and work product protection. He testified consistent with his letter to the court that he "personally reviewed the documents … [and] personally redacted them and [] personally coded them as privileged where appropriate." (Doc. 61, at 2). Early in that process, however, Mr. Peterson found that he had to manually label each individual document as "responsive" to examine it for privileged material. Thereafter, he asked Mrs. Stachowski to mass code all the documents as "responsive" after confirming that doing so would not affect his previous progress. *See* plaintiff's exhibit (Doc. 5).  On September 18, 2025, Mrs. Stachowski informed Mr. Peterson that she had completed the "responsive" mass coding. (*Id.*).

After spending approximately twenty-five hours reviewing the "responsive" data set for privilege, Mr. Peterson directed Epiq to number the pages and publish the redacted document for production to his firm. (Doc. 61, at 2). On September 26, 2018, before producing the data set, Mrs. Stachowski notified Mr. Peterson and Rachel Ayers, a paralegal for the law firm Cates Peterson, that there were around six hundred documents in the data set that had not been coded "responsive." *See*

plaintiff's exhibit (Doc. 7). Mr. Peterson testified that he believed that those documents in the data set had already been reviewed for privilege because he had just spent twenty-five hours analyzing the entire data set. Therefore, Ms. Ayers asked Mrs. Stachowski to mark them as "responsive" and to produce the data set. *See* (*id.*). However, unbeknownst to Mr. Peterson, Ms. Ayers, and even Mrs. Stachowski, those 611 documents belonged to the group of redundant documents that were previously placed in a separate administrator folder because of the threading and deduplication processes. Mrs. Stachowski admitted that she had accidentally added those previously separated documents into the reviewed data set.

On September 27, 2018, Travelers provided the data set to Bobrick. *See* plaintiff's exhibit (Doc. 8). On October 18, 2018, Bobrick, through counsel, notified Travelers that it had encountered apparently privileged documents within that data set after a preliminary review thereof. *See* plaintiff's exhibit (Doc. 9). On October 19, 2018, Travelers notified Bobrick that the disclosure of documents was inadvertent. *See* plaintiff's exhibit (Doc. 10). Throughout the following days, Mr. Peterson and Epiq investigated how the inadvertent disclosure occurred throughout the

discovery process, reaching the conclusion that the deduplicated and threaded documents were accidentally re-added to the production data set. *See* plaintiff's exhibits (Docs. 10—18). On October 29, 2018, Travelers produced an updated data set to Bobrick without the inadvertently disclosed 611 documents. *See* plaintiff's exhibit (Doc. 16).

### C.    Travelers Did Not Waive Privilege

In light of this background, Bobrick argues that "[t]he evidentiary record demonstrates that Travelers systematically failed to protect privileged information." (Doc. 243, at 5). Indeed, Bobrick suggests that Travelers made no efforts at all to protect that information. (*Id.*, at 18) (quoting *Amobi v. District of Columbia Dep't of Corr.*, 262 F.R.D. 45, 55 (D.D.C. 2009)) ("There can be no reasonable efforts, unless there are efforts in the first place."). But the record shows that Travelers undertook many steps to protect the inadvertently disclosed documents.

Travelers enlisted the help of Epiq to process Bobrick's discovery request. *See* plaintiff's exhibit (Doc. 2). As courts in this District have emphasized, "eDiscovery vendors are an increasingly common tool used in the management of high volume ESI discovery." *Lawson v. Love's Travel Stops & Country Stores, Inc.*, No. 1:17-CV-1266, 2019 WL

5622453, at *5 (M.D. Pa. Oct. 31, 2019) (citing *Race Tires Am., Inc. v. Hoosier Racing Tire Copr.,* 674 F.3d 158, 159 (3d Cir. 2012)). "Oftentimes, such vendor services can provide an orderly means of securing, retaining, reviewing and disclosing voluminous ESI." *Id.* Travelers use of an eDiscovery vendor constitutes a well-accepted and reasonable method to handle its discovery process. But Travelers also enlisted Epiq specifically to handle that process. Epiq is an eDiscovery vendor that resells "one of the most widely used software platforms for the review and production of electronically stored information." (Doc. 61). Mr. Peterson also attested that Epiq had performed over 200 matters for Travelers since 2014 without any issues. *Id.*

As part of Travelers's efforts to prevent the inadvertent disclosure, Mr. Peterson and Ms. Ayers also directed Mrs. Stachowski to label all documents as "responsive" so that Mr. Peterson could individually analyze each document to determine privilege. *See* plaintiff's exhibit (Doc. 5). Mr. Peterson then reviewed each document personally over a period of twenty-five hours. *See* (Doc. 61, at 2). He explained that "[He] reviewed the de-duplicated documents, approximately 12,000 pages... [and] personally reviewed the documents for privilege, work product

protections etc.... I did not delegate this work." (*Id.*). None of the witnesses, including Ms. Ayers, dispute Mr. Peterson's testimony.

Travelers further provided Bobrick with the requested data set with a password-protected link for Bobrick's counsel to download the documents to their system. *See* plaintiff's exhibit (Doc. 8). Moreover, Travelers sent Bobrick's counsel the password-protected link and the password for that link through two separate emails for extra security. (*Id.*). We find that these preventative measures, among others, constitute reasonable steps to prevent the inadvertent disclosure of privileged documents.

But Bobrick seemingly does not contest that those measures taken by Travelers constitute reasonable steps. Instead, Bobrick's argument that Travelers waived privileged is entirely focused on Mr. Peterson's decision to mark the inadvertently added 611 documents as "responsive" without reviewing those documents a *second* time as a precautionary measure. Bobrick argues that had Mr. Peterson reviewed those documents, he would have discovered that they contained privileged material, and therefore, Mr. Peterson acted unreasonably when deciding not to review them again. But based on the evidence in the record, Mr.

Peterson's decision not to review the documents a second time does not constitute an unreasonable measure.

Mr. Peterson testified that when he directed Mrs. Stachowski to mark the added-in 611 documents as "responsive," he was under the assumption that he had previously reviewed those 611 documents for privilege. He believed that Mrs. Stachowski had simply failed to mark them as "responsive" as she had done for the remaining previously reviewed documents. Ms. Ayers testified to the same effect. Under the totality of the circumstances, we find it reasonable that Mr. Peterson did not review a document batch that he believed had already been reviewed. Indeed, we reiterate that the standard for waiving privilege under Rule 502(b)(2) is whether Travelers took *reasonable* steps to prevent the inadvertent disclosure; the standard is not whether Travelers took *every* step possible to prevent the disclosure. *See Absolute Activist Value Master Fund, Ltd v. Devine*, 262 F. Supp. 3d 1312, 1325 (finding that although "Defendant likely could have done more[,]" the defendant took reasonable steps to prevent the inadvertent disclosure); *Urban Air Initiative, Inc. v. Envir. Protection Agency*, 2017 WL 11589178, at *1 (D.D.C. June 23, 2017) ("[T]here is no requirement that a party must

utilize every possible method to protect against inadvertent disclosure. Defendant must simply have taken reasonable steps."). The mere fact that Mr. Peterson could have reviewed the data set an additional time does not inherently mean it was unreasonable for him to do so. Without any evidence in the record to indicate that Mr. Peterson had a reason to suspect that unreviewed privileged documents were added to the reviewed data set, it cannot be said that Mr. Peterson was unreasonable in deciding not to review those documents an additional time. We cannot identify any of that evidence and Bobrick has failed to direct us to any of it as well.

Indeed, after seven years of litigating the inadvertent disclosure issue in this case, the conclusion is rather simple and unremarkable: Epiq made a technical mistake in its discovery process that led to the inadvertent disclosure despite reasonable steps taken by Travelers. Mrs. Stachowski accidentally placed privileged documents, ones taken from an administrative folder only accessible and visible to Epiq, into Mr. Peterson's data set for publication without anyone's knowledge. Mrs.

Stachowski's self-admitted mistake[7] occurred despite Travelers's reasonable steps to prevent the inadvertent disclosure rather than because of Travelers's steps to prevent that disclosure. Therefore, Travelers did not waive privilege under Rule 502(b) of the Federal Rules of Evidence.

## III.    Conclusion

For the foregoing reasons, Travelers did not waive attorney-client privilege and work-product protection under Rule 502(b) of the Federal Rules of Evidence.

An appropriate order follows.

Dated: January 14, 2026              *s/Joseph F. Saporito, Jr.*
                                     JOSEPH F. SAPORITO, JR.
                                     United States District Judge

---

[7] Mrs. Stachowski has admitted that her accidental actions led to the inadvertent disclosure. *See* plaintiff's exhibit (Doc. 14). Epiq acknowledged the same. *See* plaintiff's exhibit (Doc. 17, at 2).